**BONNOYER et al. v. UNITED STATES.**
No. 2762.

Circuit Court of Appeals, First Circuit.
Jan. 31, 1933.

John H. Backus, of Boston, Mass., for appellants.

William W. Gallagher, Asst. U. S. Atty., of Portland, Me. (Frederick R. Dyer, U. S. Atty., of Portland, Me., on the brief), for the United States.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

On September 22, 1931, Oscar and Ernest Bonnoyer, John Henry Brennan, alias John Henry, William De Nadal, alias William J. Kingelback, Charles Basil Bachman, alias Charles Backman, Abraham Greenfield, alias Abe Greenfield, and Joseph Turgeon were indicted in two counts in the District Court for Maine. The first count charged them with continuously, from February 1, 1931, to July 10, 1931, conspiring together and with each other and with divers other persons, at York in the District of Maine, to violate section 3, title 2, of the National Prohibition Act (27 USCA § 12), by knowingly and unlawfully possessing intoxicating liquor; and the second with, during the same period and at the same place, conspiring to violate the same section by unlawfully and knowingly transporting intoxicating liquor. The overt acts, eleven in number, are the same in both counts and are all alleged to have occurred in the District of Maine in April, May, and June, 1931.

On January 13, 1932, the defendants Oscar Bonnoyer, Brennan, De Nadal, Greenfield, and Turgeon were arraigned, pleaded not guilty, and had a jury trial. At the close of the evidence, by direction of the court, the jury returned a verdict of not guilty as to Brennan and De Nadal, found Greenfield and Oscar Bonnoyer guilty, and disagreed as to Turgeon. Oscar Bonnoyer was sentenced to two years' imprisonment and to pay a fine of $2,000. Greenfield was sentenced to imprisonment for two years. From these sentences this appeal is taken.

In the assignments of error relied upon the defendants complain that the court erred in denying their motion that upon all the evidence the court instruct the jury to return verdicts in their favor.

In general, the government's evidence tended to show that on March 29, 1931, the defendant Greenfield approached one Ernest Hasson, a member of the state highway police of Maine, while he was patrolling the state highway in York, Me.; that he then said he was connected with a big syndicate in Massachusetts (a bootlegging syndicate), and wanted Hasson to arrange to have one Weaver, a federal prohibition agent in charge of the Southern Division of Maine, meet him at Kittery, Me., on April 1; that this arrangement was made, and Hasson and Weaver met Greenfield on April 1 at the place appointed; that with Greenfield was Ernest Bonnoyer, who was introduced to Weaver as "one of the big shots" with whom Greenfield claimed to be associated in Massachusetts and Rhode Island; that at this interview Ernest Bonnoyer stated that it had become difficult to work along the coast of Massachusetts and Rhode Island on account of the activities of the Coast Guard Patrol, and he wanted Weaver to show him some "drops" (landing places where a small boat could make con-

tact with the shore and land contraband); that Weaver, Hasson, Bonnoyer, and Greenfield then looked over certain landing places in the town of York, Me.; that Bonnoyer told Weaver they were having a boat built, and, when they got it working in good shape, would land from 1,500 to 3,000 cases a month, and that they would pay Weaver a dollar and a half a case for protection; that Ernest Bonnoyer was to return to Massachusetts and get in touch with his brother, Oscar Bonnoyer, who is referred to also as "Marty."

It further appeared that, on April 16, 1931, Greenfield and Oscar Bonnoyer were in Portland, and there met Weaver. That they told him they wanted to talk this deal over with him. That the three of them rode in Weaver's car from Portland to York, where Weaver lived. That during the ride Oscar Bonnoyer complained of having been badly hit lately and losing "boats, booze and everything else." That allusion was made to the confidence Greenfield and Bonnoyer had in Weaver. That at Bonnoyer's request Weaver showed them some drops along the coast in York, and discussion was had as to the feasibility of getting boats to them and in handling the liquor after it was landed. That Oscar Bonnoyer anticipated that 1,500 to 3,000 cases a month would be landed and told Weaver it would be worth to him $1.50 a case. That it was understood that Weaver should take care of three or four other men, Weaver saying: "I will see what I can do." That during this meeting Bonnoyer said: "The Coast Guard have been very active down our way and we want to work up in this section where the boats are not so active and where we can work on a perfect protection plan." That during the conversation Weaver also said: "I am sort of leery of you fellows, and don't know whether I ought to play with you or not," to which Bonnoyer replied: "If there is any doubt about me you get in touch with Fat Richardson; he will tell you I am all right." That Fat Richardson was formerly a prohibition agent. That Greenfield was present during all this conversation. That the three men then went to Portsmouth, N. H., where Bonnoyer introduced Weaver to Bachman, the driver of Bonnoyer's car, saying "Meet the skipper." That he also said to Bachman: "Charlie, I want you to come over there and look at those drops. They are pretty good; and I want you to look at Cape Neddick and get the location of that reef"; and that Bonnoyer told Weaver he would call him up within a few days.

That on May 3 Weaver and Greenfield met in Kittery as a result of a telephone call from Greenfield. That on May 4 Greenfield telephoned Weaver that Oscar Bonnoyer would see him with the skipper (Bachman) on May 6. That on that day Weaver, Oscar Bonnoyer, and Bachman met in York, and several places along the coast were looked over for landing places. That, on Bonnoyer learning from Bachman that he had not brought any charts with him, Weaver said he would get some charts, and later did so through Hasson. That later, on the same day, as a result of a telephone call from Greenfield, Weaver met Greenfield at York Corner, in Maine, where a plan was proposed by Greenfield of having liquor stored in Maine and selling it around Bangor and Lewiston.

That on May 12, as a result of a telephone call from Greenfield the day before, Weaver again met Greenfield at York Corner, and further talk was had about bringing liquor into Maine and storing it with one Turgeon who lived in Auburn, Me. That Weaver demurred to playing with Turgeon, as he had been previously arrested and was then on probation. That, on Weaver asking Greenfield what had happened to the boat deal, Greenfield said they were having all sorts of trouble with the engine, compass, and weather; and that Greenfield left with the understanding that he would see Oscar Bonnoyer.

That on May 16 and 19 there were further meetings between Weaver and Greenfield, both at the suggestion of the latter.

That on May 31 Hasson, while patrolling the state highway from York to Kittery, met Greenfield in a car, and on motion from Greenfield stopped. That, after some conversation, Greenfield dropped something in the road and told Hasson, who called his attention to the fact that he had dropped something, to keep it, and drove off. That this turned out to be $25, which Hasson took to his captain, William P. Hancock.

That on June 9, 1931, Weaver, Greenfield, Oscar Bonnoyer, and Brennan met at York Corner, went on towards Cape Neddick, and turned into a wood road. That Greenfield said he and Bonnoyer were going to see Turgeon. That Bonnoyer said they had had a lot of hard luck with the boat proposition and he had decided to place some big orders in Maine. That he had a three-ton van and was planning to run in about 1,000 gallons a week if Weaver could give him proper pro-

tection. That they could give Weaver more out of it than on the boat deal—50 cents a can, and, if some of the outside people who were lugging alcohol into Lewiston and Bangor could be knocked off, they could drive the price up and give Weaver a dollar a can.

That on June 10, as a result of a telephone call from Greenfield to Weaver, Oscar Bonnoyer, Brennan, and Weaver met in the same wood road near Cape Neddick. That Bonnoyer spoke again about knocking off their rivals and boosting the ante to $1 a can. That he said he had talked with Turgeon and made arrangements to store 1,000 to 1,200 gallons in Turgeon's house or barn; and that at this meeting Bonnoyer handed Weaver a hundred dollar bill.

That on June 13 there was a meeting between Weaver and Greenfield, and on June 14 Greenfield telephoned to Weaver requesting a meeting on June 16.

That on June 16, on a telephone call from Greenfield, Weaver met Greenfield and Bonnoyer at the Union Station in Portland and later at the wood road near Cape Neddick, the conversation at both places being carried on principally by Bonnoyer.

That on June 18, as a result of a telephone call from Greenfield, Weaver met the latter at Gray, Me., and, at the request of Greenfield, they went to the home of Joseph Turgeon, where there was conversation between Greenfield and Turgeon about storing alcohol in Turgeon's barn, and between Weaver and Turgeon with reference to Weaver's attitude.

That on June 19, 1931, Greenfield told Weaver "that the truck job would come through within a week or ten days." That on June 26, as a result of a telephone call from Greenfield, Weaver met Greenfield in the wood road previously mentioned, and Greenfield reported that the truck would be in Maine the following day. That later Greenfield telephoned Weaver that everything would go through the next day and further said: "Meet us at Rockingham around noon."

That on June 27, 1931, at about 1:10 a. m., Weaver received a telephone call from Oscar Bonnoyer at Fall River, Mass., who said: "Everything is all set. Abe is going to leave Boston with the truck. How is everything on that end?" Weaver said: "Fine, I will look out for everything." That arrangements were then made to meet at the Rockingham Hotel in Portsmouth at 12 o'clock that day. That Weaver, with Capt. William P. Han-

cock and Ernest Hasson of the Maine State Police (the latter two being in their police uniform), went to the Rockingham Hotel, and about 12:25 Oscar Bonnoyer drove up. That, at the suggestion of Bonnoyer, they all went to Newburyport, Mass., to meet Abe Greenfield with the truck. That, upon the truck reaching Newburyport, Bonnoyer in his car, and the three officers in Weaver's car, accompanied it to Turgeon's house in Auburn, Me.; that there the truck with twenty-two drums containing a total of about 1,166 gallons of alcohol thereon, was seized, and Bonnoyer, Greenfield, Brennan, and De Nadal (the two latter being with the truck) were arrested.

█ In the brief and argument before us, the appellants do not contend that there was no evidence that the defendants entered into a conspiracy between themselves and with others as charged in the indictment. This was the only question raised by their motion for a directed verdict. There was abundant evidence to that effect, and the motion was properly denied.

██ They now, however, base their contention on the ground that, where a person is enticed or induced by an officer of the law to commit a crime he would not otherwise have committed, for the purpose of arresting and prosecuting him, the law will not sanction a verdict of guilty. This question is not properly before us, as it was not raised by the motion. But, if it had been, these two defendants, the appellants, cannot benefit by the contention, for as to them the evidence shows that they were the instigators of the plan to violate the law, and that the officers merely acceded to their suggestions and allowed the defendants to assume that they would be protected in carrying out the plans which they, themselves, had formulated. It is true that Turgeon testified that Weaver promised him protection for the purpose of inducing him to enter into the conspiracy, but Weaver denied this, and the court would not have been warranted in directing a verdict even in favor of Turgeon on that state of the evidence—much less in favor of these defendants.

█ The defendants further contend that the court erred in refusing their request for a directed verdict on the ground that the three officers, by accompanying the truck from Newburyport, Mass., through New Hampshire and into Maine, should not be "permitted to invade the dominion of two separate sovereignties [Massachusetts and New Hampshire] so that prosecution may be

begun in the particular district that the Federal Agents select" (Maine). This is now suggested for the first time, and is not open to the defendants. Furthermore, if Bonnoyer and the officers may have considered that the latter's presence would facilitate the passage of the truck through Massachusetts and New Hampshire into Maine, no inference can be drawn from the evidence that the enforcement of the laws of those states was in any way obstructed by them. The defendants cannot complain because they were not arrested in Massachusetts instead of in Maine, and no right of theirs, constitutional or otherwise, was invaded.

Exceptions were taken to evidence relating to the finding of a bottle of intoxicating liquor in the car of Bonnoyer on the trip from Massachusetts to the home of Turgeon in Maine, and to the seizure of the bottle and its admission in evidence as an exhibit, on the ground that its transportation was no part of the conspiracy proved. The conspiracy which the evidence tended to prove was to transport intoxicating liquor from Rhode Island or Massachusetts into Maine and there store it for future sales. It was for the jury to say whether the transportation of the half pint bottle was in furtherance of the conspiracy or not. But, however that may be, it could not have prejudiced the defendants in view of the overwhelming evidence that on the same trip they transported some 1,166 gallons of intoxicating liquor in furtherance of their conspiracy.

Exceptions were taken to the admission of evidence relating to the $25 given to Hasson by Greenfield and the $100 given by Bonnoyer to Weaver. There can be no doubt that this evidence was competent as showing steps taken by the defendants to carry out their conspiracy.

Exceptions were taken to a conversation about a tip which had resulted in Greenfield's car being seized and his wife arrested; to the introduction in evidence of a receipt for 35 three-gallon cans, which receipt was taken from the person of Greenfield at the time of his arrest; and to the ruling of the court that a question put on cross-examination of Weaver had been sufficiently answered. If any of this evidence was incompetent, the defendants were not prejudiced by its introduction; and, so far as concerns the question put upon cross-examination, we think that the jury understood the situation as fully as though the question had been further answered, as the defendants' counsel

desired, and that all these matters here complained of are inconsequential.

After counsel had completed their arguments, and as the court was about to charge the jury, the defendants presented requests for rulings. At the conclusion of the charge the judge said: "Now there were a great many requests for rulings here, and my thought is that I shall deny them all except so far as I have covered them in my charge, and, if counsel consider I have omitted or forgotten anything, I would like to have them call my attention to it." To this counsel made no reply.

Several assignments of error are based on the court's failure to give these requests, but no exceptions were taken to the action of the judge in this respect. There is, therefore, no basis for these assignments.

The judgments of the District Court are affirmed.